# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

ZACHERIA DANIEL HAWKINS,  )
                                           )
              **Plaintiff,**     )
v.                               )     **Case No. CIV-16-527-JHP-SPS**
                                           )
NANCY A. BERRYHILL,        )
**Acting Commissioner of the Social**  )
**Security Administration,**[1]      )
                                         )
            **Defendant.**    )

## REPORT AND RECOMMENDATION

The claimant Zacheria Daniel Hawkins requests judicial review pursuant to 42 U.S.C. § 405(g) of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for benefits under the Social Security Act. The claimant appeals the decision of the Commissioner and asserts that the Administrative Law Judge ("ALJ") erred in determining he was not disabled. For the reasons discussed below, the Commissioner's decision should be REVERSED and the case REMANDED to the ALJ for further proceedings.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Ms. Berryhill is substituted for Carolyn Colvin as the Defendant in this action.

severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997) [citation omitted]. The term substantial evidence has been interpreted by the United States Supreme Court to require "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The Court may not reweigh the evidence nor substitute

---

[2] Step one requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires the claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities. *Id*. §§ 404.1521, 416.921. If the claimant is engaged in substantial gainful activity, or if his impairment is not medically severe, disability benefits are denied. At step three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant suffers from a listed impairment (or impairments "medically equivalent" to one), he is determined to be disabled without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must establish that he lacks the residual functional capacity (RFC) to return to his past relevant work. The burden then shifts to the Commissioner to establish at step five that there is work existing in significant numbers in the national economy that the claimant can perform, taking into account his age, education, work experience and RFC. Disability benefits are denied if the Commissioner shows that the claimant's impairment does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

its discretion for that of the agency. *Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). Nevertheless, the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

### Claimant's Background

The claimant was born on October 13, 1976, and was thirty-nine years old at the time of the most recent administrative hearing (Tr. 1292).    He attended high school through the tenth grade while attending special education classes, completed his GED, and has worked as a construction worker II, dishwasher, electrician's helper, and receiving operator (Tr. 170, 1277).    He alleges inability to work since December 31, 2006, due to left foot numbness, pain in his left leg, numbness in the right foot, back spasms, public anxieties, and back pain (Tr. 170, 209).

### Procedural History

The claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85, on August 11, 2011.    His applications were denied.    ALJ Trace Baldwin conducted an administrative hearing and determined that the claimant was not disabled in a written opinion dated October 7, 2013 (Tr. 11-21).    The Appeals Council denied review, but this Court reversed in Case No. CIV-14-63-RAW-SPS and remanded with instructions to properly consider the evidence related to the claimant's mental impairments (Tr. 1454-1467).    On remand, ALJ Baldwin

3

held a second administrative hearing and again determined that the claimant was not disabled in a written decision dated August 8, 2016 (Tr. 1265-1278). The Appeals Council again denied review, so ALJ Baldwin's 2016 written opinion is the final decision of the Commissioner for purposes of this appeal. *See* 20 C.F.R. §§ 404.981, 416.1481.

### Decision of the Administrative Law Judge

The ALJ made his decision at steps four and five of the sequential evaluation. Although he previously determined that the claimant could perform a limited range of sedentary work, in this decision the ALJ found that the claimant had the ability to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), but that the RFC was "compromised" as follows: occasionally sitting/standing at the work station with no loss of productivity; occasionally push/pull with upper and lower extremities, stoop, kneel, crouch, and climb ramps and stairs; frequently balance; never climb ladders, ropes, or scaffolds, and cannot work around unprotected heights or unstable work surfaces. The ALJ noted that the claimant had no visual or communicative limitations. Finally, he found that the claimant could carry out simple work-related tasks, could work with co-workers and supervisors but have no contact with the general public, and that he could adapt to routine changes in the work setting (Tr. 1269). The ALJ thus concluded that the claimant could return to his past relevant work as a dishwasher, and alternatively, that there was other work he could perform, *i. e.*, motel cleaner, price marker, final assembler, grinding machine operator, and addresser (Tr. 1278).

4

## Review

As with his previous appeal, the claimant again contends that the ALJ erred in evaluating his mental impairments.  More specifically, he asserts that the ALJ failed to properly evaluate his counselor's other source opinion, failed to properly evaluate a consultative examiner's opinion, and failed to update the record by obtaining an updated medical expert opinion.  The undersigned Magistrate Judge agrees that the ALJ once again did not properly assess the claimant's RFC with regard to his mental impairments, and the decision of the Commissioner should be reversed.

As in his original opinion, the ALJ found the claimant's severe impairments were depression, anxiety, degenerative disc disease, degenerative joint disease, chronic pain syndrome, substance abuse, and hypertension, and that he had the additional nonsevere impairment of mitral regurgitation (Tr. 12-13, 1267).  As noted previously, the evidence related to the claimant's mental impairment reflects that the claimant was regularly noted by his treating physicians and emergency department medical records to have chronic anxiety and panic attacks, and was prescribed medications (Tr., *e. g.*, 303, 333, 340, 394, 400, 401, 418, 427, 431, 453, 477, 550, 552, 702, 704, 708, 769, 962, 974, 988, 996, 1022, 1068).  The claimant was referred for intake at Mental Health Services of Southern Oklahoma on October 5, 2007, and assessed with panic disorder and post-traumatic stress disorder (PTSD) along with a global assessment of functioning (GAF) score of 51 (Tr. 795).  On April 3, 2009, the claimant returned to MHSSO to begin treatment and went through intake, but never returned (Tr. 779).  At intake, he was assessed with PTSD and a GAF of 50 (Tr. 780).

On November 3, 2011, Dr. Patrick Turnock, Ph.D., conducted a mental status examination of the claimant. He took the claimant's history and then assessed the claimant's mental status, noting, *inter alia*, that the claimant was clean and appeared to have adequate hygiene, he admitted to olfactory hallucinations, his affect was restricted but mood was normal, and his IQ appeared to be above 80 (Tr. 575-576). He further noted that the claimant's long-term memory appeared to be impaired but short-term memory and concentration were intact, his judgment and insight were good, and his impulse control was fair (Tr. 576). Dr. Turnock provided no Axis 1 diagnosis, but stated in this recommendations that the claimant:

> suffers from a thought and perception disorder that impairs his judgment and ability to recognize reality. He is disabled to the point that he is unable to care for himself so that his health and/or safety is endangered. He has repeated episodes of decompensation. His overall adjustment to stress is poor. He is currently being treated by his physician. His prognosis is poor and the duration is unknown secondary to his chronic pain. No additional testing or evaluation is recommended. If he were awarded benefits, he is not able to manage his own funds.

(Tr. 577).

One month later, a state reviewing physician found that, from December 31, 2006 through March 31, 2008, there was insufficient evidence of a medically determinable mental impairment, noting that there "is evidence to suggest that clmt has [a diagnosis] related to anxiety, but insufficient evidence to related [sic] to ADLS and overall functioning" (Tr. 588-600). She then determined that from August 11, 2011 through December 12, 2011 (the date of the review), the claimant's anxiety was a nonsevere mental impairment and caused only mild limitations (Tr. 607-613). In support, she

6

summarized many of the positive findings from Dr. Turnock's exam as well as his lack of diagnosis, but did not mention the recommendations (Tr. 614).

On May 18, 2012, state reviewing physician Dan M. Cox, Ph.D., completed a psychiatric review technique, finding that the claimant's anxiety was not a severe impairment and that he had only mild limitations in the areas of functioning (Tr. 622-632). Dr. Cox noted Dr. Turnock's consultative examination, including an IQ estimated greater than 80, impaired long term memory, short term memory and concentration intact, good judgment and insight, and no diagnosis, but did not mention Dr. Turnock's recommendations (Tr. 634).

In addition to the regular treatment notes, the claimant was placed in inpatient treatment for suicidal thoughts repeatedly (five times) from 2013 through 2015. Through treatment at MHSSO, the claimant was placed on the crisis stabilization unit (CSU) from May 30-June 4, 2013, with reports of suicidal ideation after he called his mother to say goodbye (Tr. 1378). He was discharged with two weeks of medication and a follow-up appointment (Tr. 1378). His primary diagnosis was major depressive disorder, recurrent episode severe, without mention of psychotic behavior, along with a secondary diagnosis of PTSD (Tr. 1378-1379). His GAF upon discharge was 25 (Tr. 1379). The claimant presented to MHSSO in June 2013 following his suicide attempt and began treatment. He was diagnosed with bipolar I disorder, most recent episode (or current) depressed-severe, specified as with psychotic disorder, as well as PTSD, and assigned a GAF of 42 (Tr. 1214, 1218). Notes from July 29, 2013 stated that his prognosis was fair "because he seems to have difficulty leaving his house" (Tr. 1216).

7

On August 30, 2013, Wadonna Wells, MS LADC, completed a mental RFC assessment form, indicating that the claimant was moderately limited in ten areas: the ability to remember locations and work-like procedures, understand and remember detailed instructions, carry out detailed instructions, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others (Tr. 1257-1261). She further indicated that the claimant had marked limitations in three areas: the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the ability to complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 1257-1261). She summarized the claimant's reports of his impairments, then stated, "I do not believe Zacheria would be able to maintain any meaningful employment at this time" (Tr. 1261).

The claimant was again placed on the CSU from February 28-March 5, 2014. When he was admitted, he reported audio hallucinations and possible suicidal ideations, along with no memory of what brought him to the emergency room or CSU (Tr. 1377). Upon discharge, he was considered to have met interventions and was discharged with two weeks of medications and an outpatient follow-up appointment (Tr. 1372).

8

The claimant was again admitted for inpatient treatment from October 22-29, 2014, following presentation of suicidal ideation, depression, and alcohol abuse (Tr. 1335). He was discharged with two weeks of medication and an outpatient appointment with MHSSO in Ardmore, Oklahoma (Tr. 1335). At the time of his admission, he was assessed with major depression, generalized anxiety, alcohol withdrawal, alcohol dependence, and polysubstance abuse, along with a GAF of 25 (Tr. 1357). His estimated risk of suicide was moderate to high based on a recent suicide attempt, previous lethal suicide attempt, active alcohol use, and increased anxiety (Tr. 1357). His primary diagnosis upon discharge was major depressive disorder, along with a secondary diagnosis of alcohol abuse (Tr. 1335).

On April 15, 2015, the claimant was hospitalized for a suicide attempt, noting sleeping difficulty, auditory hallucinations, hostility, racing thoughts, and a vague plan (Tr. 1598, 1603). He was again hospitalized beginning April 30, through May 8, 2015, for suicidal ideation (Tr. 1612-1614). His discharge diagnosis included psychotic disorder NOS, anxiety disorder NOS, mood disorder NOS, polysubstance dependence, and rule out PTSD (Tr. 1614).

The regular treatment notes from 2014 through 2016 indicate attempts to get the claimant to apply for inpatient rehab, but that he expressed concerns regarding anxiety being around other people, as well as concerns about wanting to stay in the house with his mother (Tr. 1680, 1695, 1703, 1709).

At the most recent administrative hearing, the claimant testified as to his impairments, then the ALJ called Dr. Nancy Tarrand, a psychiatrist, to testify as to her

opinion of the claimant's impairments based on a review of the record (Tr. 1305-1325). She noted that his medical history involved various substance abuses, but concluded that, if substance use were removed from consideration, the claimant's impairments did not meet or equal a listing (Tr. 1307). She explained further that it was her opinion "that the claimant's use of substances is significantly correlated with various decompensations and exacerbations in his mental health, such as psychosis, violent behavior, he needs to go to hospitals, or be taken to jail, and that without those – without the substance use it's my opinion that those events would not be occurring" (Tr. 1310). When asked about the use of drugs as a mechanism to compensate for or quell childhood trauma, she agreed that the record did reflect statements from the claimant to that effect (Tr. 1311-1312), and stated that the claimant had provided variable reports as to his childhood trauma but asserted that she was not implying that the claimant made anything up (Tr. 1312). In response to her testimony, her representative indicated that she wanted to take Dr. Tarrand's assessment to other psychiatrists for their opinions, but the ALJ stated that he would not hold the record open any more (Tr. 1315). In continuing her testimony, Dr. Tarrand stated that she did not believe substance use to be the root cause of the claimant's agoraphobia (Tr. 1316). As to Dr. Turnock's opinion, she indicated that she did not believe his assessment made sense, even going so far as to question whether the opinion had been cut and pasted from some other patient (Tr. 1322). When asked what the claimant's functional ability was if the claimant were sober from drugs and alcohol, she opined that "he would do best in a situation that involved only occasional interactions with supervisors and coworkers, occasional interactions with the public that were not

10

required as part of his job duties.  I think he could do simple instructions.  I would take him out of complex instructions.  He would need to work in a setting where alcoholic beverages are not served or manufactured."  She continued, noting that some restrictions might be medication-related, such as, "[H]e should not engage in commercial driving, or work around dangerous unguarded machinery, and he should not work in situations of excessive heart, such as, say, doing outdoor work in the summer."  (Tr. 1323).

In his written opinion, the ALJ summarized the claimant's testimony and most of the medical records.  The ALJ summarized Dr. Turnock's opinion, noting that Dr. Turnock made no Axis I or Axis II diagnoses but had stated that the claimant suffered from a thought and perception disorder, had repeated episodes of decompensation, and his overall adjustment to stress was poor (Tr. 1271).  Although directed by this Court in the previous decision, the ALJ again provided no analysis of Dr. Turnock's assessment.  He then noted Ms. Wells's mental RFC assessment, but gave it little weight because it was inconsistent with unspecified other medical sources and because "counselors are not an acceptable source of medical evidence" (Tr. 1273).  Without noting the claimant's March 2014 inpatient hospitalization, the ALJ summarized the "mental status examination" conducted upon his discharge and noted the claimant's diagnosis and listed all the claimant's "normal" findings, including no hallucinations (Tr. 1273).  He summarized a number of the more recent treatment notes, focusing almost solely on the claimant's reports of drug or alcohol use coupled with "relevant negative findings" such as normal gait, no abnormal movements, good eye contact, and no suicidal ideation (Tr. 1274-1275).  The ALJ did note the claimant's May 2015 hospitalization, focusing on

his discharge to his own custody and the fact that he was not an imminent danger to himself or others (Tr. 1274-1275).  In conclusion, the ALJ re-stated the claimant's impairments, and noted that the claimant had engaged in drug-seeking behavior regarding his physical impairments, and asserted that the claimant's "mental impairments cause no more than moderate psychological limitations" (Tr. 1276).  He then listed a number of reasons for finding the claimant not credible, including the fact that state reviewing physicians found he did not have a severe mental impairment (despite the fact that the ALJ himself did in fact find he had multiple severe mental impairments), and that Dr. Turnock had not made a diagnosis (Tr. 1276-1277).  Additionally, the undersigned Magistrate Judge notes that, although the ALJ called Dr. Tarrand to provide an opinion at the administrative hearing, he made no mention of her testimony, nor of her opinions provided, in his written decision.  Indeed, he incorrectly stated that another medical doctor testified, but that doctor was called but unable to testify because he had not received the claimant's record (Tr. 1265, 1325-1326).

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional. . . . An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) [internal citation omitted] [emphasis added], *citing Goatcher v. United States Department of Health & Human Services*, 52 F.3d 288, 290 (10th Cir. 1995).  The pertinent factors are: (i) the length of treatment relationship and frequency of examination; (ii) nature and extent of the treatment relationship, including the treatment

12

provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Watkins v. Barnhart*, 350 F.3d 1297, 1300-01 (10th Cir. 2003), *citing Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001). Here, the ALJ again faithfully summarized those parts of the record that reflected the claimant had normal or negative findings or good results, but did not properly address the claimant's five hospitalizations for suicidal ideation within two years, Dr. Turnock's opinion as to the claimant's poor prognosis, nor Ms. Wells's evaluation of the claimant's impairments. *See, e. g., Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) ("An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability."), *citing Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) and *Hamlin*, 365 F.3d at 1219 (10th Cir. 2004). *See also Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001) ("Although the ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision, especially when that evidence is 'significantly probative.'"). This was a significant omission here because, as stated previously in the undersigned Magistrate Judge's Report and Recommendation, these limitations discussed directly impact the claimant's ability to perform work. Furthermore, a lack of diagnosis is not the same thing as a lack of opinion. Indeed, the ALJ again devoted much of his discussion at step four to

questioning his determination of severe mental impairments at step two, *i. e.*, the severity of these impairments, and compounded this error by discounting the claimant's credibility because Dr. Cox and Dr. McKenzie found he did not even have a severe mental impairment (Tr. 1276-1277).  In any event, as stated in this Court's previous remand and in direct contradiction to the Commissioner's assertion, it was clearly error for the ALJ to implicitly reject Dr. Turnock's opinion without explaining why.  *See Hamlin*, 365 F.3d at 1215 ("An ALJ must evaluate every medical opinion in the record[.]").  *See also Martinez v. Astrue*, 422 Fed. Appx. 719, 725 (10th Cir. 2011) ("To be sure, the ALJ may have had his reasons for giving portions of Dr. LaGrand's opinion 'great weight,' but then disregarding other, probative portions of her opinion.  However, before doing so, the ALJ was required to discuss why he ignored this evidence.") [internal citations omitted].  Instead, the ALJ should have explained why the claimant's severe mental impairments did not call for corresponding limitations in the RFC.  *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence that he rejects."), *citing Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir 1984).

The claimant's argument is further supported by the ALJ's improper assessment of Ms. Wells's opinion.  Social Security regulations provide for the proper consideration of "other source" opinions such as those provided by Ms. Wells herein.  *See, e. g., Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007) (noting that other source opinions should be

evaluated with the relevant evidence "on key issues such as impairment severity and functional effects" under the factors in 20 C.F.R. §§ 404.1527, 416.927), *quoting* Soc. Sec. Rul. 06-03p, 2006 WL 2329939 at *3, *6 (Aug. 9, 2006) ("[T]he adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."). The factors for evaluating opinion evidence from "other sources" include: (i) the length of the relationship and frequency of contact; (ii) whether the opinion is consistent with other evidence; (iii) the extent the source provides relevant supporting evidence; (iv) how well the source's opinion is explained; (v) whether claimant's impairment is related to a source's specialty or area of expertise; and (vi) any other supporting or refuting factors. *See* Soc. Sec. Rul. 06-03p, at *4-5; 20 C.F.R. § 404.1527(d). *See also Anderson v. Astrue*, 319 Fed. Appx. 712, 718 (10th Cir. 2009) ("Although the ALJ's decision need not include an *explicit discussion* of each factor, the record must reflect that the ALJ *considered* every factor in the weight calculation.") [emphasis in original] [internal citations omitted].

Here, the ALJ did not apply these factors, instead initially discrediting her opinion because it was inconsistent with other unidentified evidence and because she is an "other source." This appeared to be an effort to bolster the ALJ's attempt to discredit or minimize the evidence of the claimant's objectively-documented severe mental impairments. *See, e. g., Clifton*, 79 F.3d at 1010 ("[I]n addition to discussing the

15

evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.") *citing Vincent ex rel. Vincent v. Heckler*, 739 F.3d 1393, 1394-1395 (9th Cir. 1984).  The Commissioner argues that although it may have been "desirable" for the ALJ to explain his analysis further, it was not necessary to comply with such a "hyper-technical requirement."  But where, as here, such an error directly relates to findings regarding the claimant's RFC, the decision of the Commissioner should be reversed and the case remanded to the ALJ for further analysis.

Accordingly, the decision of the Commissioner is not supported by substantial evidence because the ALJ did not perform a proper analysis of newly-submitted "other source" evidence, and further failed to properly evaluate the treating and consultative opinions contained in the record.  As such, the decision of the Commissioner should be reversed and the case remanded for further analysis by the ALJ.  If this results in adjustments to the claimant's RFC, the ALJ should then re-determine what work, if any, the claimant can perform and ultimately whether he is disabled.

## Conclusion

The undersigned Magistrate Judge hereby PROPOSES a finding by the Court that correct legal standards were applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence.  The undersigned Magistrate Judge thus RECOMMENDS that the Court reverse the decision of the Commissioner and remand the case for further proceedings.  Any objections to this Report and Recommendation must be filed within fourteen days.  *See* Fed. R. Civ. P. 72(b).

16

**DATED** this 9th day of February, 2018.

**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**